The next case is United States of America v. Uranga and Oliva. Mr. Mendelson is here for the appellants. Mr. Cashall is here for the government. Mr. Mendelson, when you're ready, begin. Morning. May it please the Court. I'm here with Esther Panitch for Mr. Oliva, but we won't be splitting the argument since the issues are identical. The government has a constitutional duty to make a diligent, good-faith effort to locate and apprehend a defendant after he's been indicted. In this case, the government made no effort for two years to attempt to apprehend the two defendants. Twenty-three months, right? Well, it was 23 months, but this Court's case law tells us that it's the 23 months plus the time it takes to resolve the speedy trial issue. So we're talking about a length of delay of 34 months in total. And that comes from Villareal and then I think it's footnote 3 in Ingram. But are you only, is the basis of your argument really only the post-indictment delay? You're not really concerned about the pre-indictment delay? Yes. Pre-indictment delay is something that can be considered, but I think it's inordinate within the meaning of our case law here. I'm trying to figure out whether this is really a 24-month case or a nearly four-year case. Well, I think it's a 34-month case based on the, from the time of the indictment to the time of the resolution of the speedy trial motion. That's the time that I think is the most important. Now, I thought in your briefs you were really arguing that this was, that the relevant time frame was between the time of the indictment and the time of the arrest. Well, that's the part where the government did absolutely nothing. But this court's case law tells us that when you're looking at the total length of delay, you go all the way to the time of the resolution of the speedy trial. But is it your contention that the last 10 months, we'll call it, between the arrest and the resolution of the speedy trial motion that there was some dilatory conduct? No, I don't, I'm not saying there's any dilatory conduct. But in terms of when we're talking about, you know, is it 24 months, is it 36 months, is it 48 months, like I say, Lee, Rial, and Ingram tell us the magic number is 34. Okay. Well, the Court applied the Barker v. Wingo factors. Why don't you tell us why the Court erred in its application of those four factors? Sure. Well, I think there's no doubt that we, on the first factor, we have the presumptive prejudice because it's over one year. I think that's agreed. I think it's also agreed that the issue was raised timely. So I think that's off the table because it was raised at the first appropriate time. The question then, there is reason for the delay, which we take the position that the finding of gross negligence by the District Court is pretty close to a finding of lack of diligence. And the place where the District Court went wrong here is the District Court required a lack of diligence plus bad faith in order for there to be, to have the reason for the delay ground count heavily against the government. That's not in the case law. And in fact, it's directly contradicted by Ingram because in Ingram, there is a finding that there was good faith on the part of the officer in looking for the defendant, but that his action wasn't diligent. And that lack of diligence was the problem. I thought the big difference between Ingram and this case is that in Ingram, we said, this guy, the officer knew that he was the only law enforcement agent responsible for the name of Clark. In this case, different. I mean, like it's, I don't know, it's a mix-up, but it's not just rank laziness. Well I think that one distinction between the two cases, but I think there are maybe three really key distinctions between Clark and Ingram. First, there's a finding in our case of gross negligence. Clark was mere negligence. And the gross negligence finding here is, we've been calling it an utter lack of diligence. The district court called it gross negligence. I think they're pretty much the same thing when you start reading the way they were talking. So we've got a more extreme finding of governmental inaction than we had in Clark and probably even in Ingram. But without respect to labels, gross negligence, mere negligence, whatever, I mean, isn't the underlying misconduct, mix-up, whatever you want to call it, the same here as in Clark? I mean, there was this, and it's almost identical, this state law officer who's tasked to a federal agency, thinks that they do it and the feds do it the way the state prosecutors do it. Seems like almost identical to Clark. Well, I think superficially it's similar. Marshall's responsibility, Marshall's responsibility. We have a local police officer in Clark as opposed to a federal task force agent, a deputized federal agent here. On top of that, we have a record in our case that the assistant United States attorney did nothing. A simple phone call to the case agent, Donnelly, saying, hey, why haven't these guys been arrested? Donnelly says, well, the Marshalls haven't done it. The U.S. attorney says, no, that's your job. I mean, that's a 30-day, maybe, delay. At some point, the U.S. attorney has to take responsibility for this. And so, but then we have, we couple that with the co-worker, Thompson, who's also a federal agent, who actually knew. Thompson knew that Donnelly did not understand the situation. He thought the Marshalls had to arrest him. Thompson called the Marshalls, found out, no, Donnelly's wrong, it's the FBI's obligation, and at least according to his testimony, did not go back and tell Thompson. I'm sorry, did not go back and tell Donnelly. Thompson's knowledge, that collective knowledge there puts us beyond where we were in Clark with just some local police officer sitting out on his own. In fact, it seems to me it's dilatory for Thompson not to tell Donnelly that you're wrong. And so that makes it even more egregious than what we have in Clark. And puts us over the edge to, about as close to the extreme that would require it to be weighed heavily. How are the appellants in this case prejudiced by the delay? Are they, it seems like if there's any prejudice, it would go to the government rather than to the defendants. How are they prejudiced? They were out on bond, they weren't being detained, with a 23-month delay. How are they prejudiced? Well, it's not, we're not riding on an actual prejudice theory. If we could show actual prejudice, we wouldn't be here. I think if we showed actual prejudice in the court below, it's over. But what the case law says is we don't have to show actual prejudice. Prejudice is presumed in these situations where you have a delay of 24 months, 34 months. Things happen, memories... I thought we said it's presumed that the first two Barker versus Wingo factors weigh heavily against the government. It is. Okay. And it's, and...  But not heavily against the government, taking into consideration the length of the delay, 23 months, and the reason for the delay, negligence. Right. That's exactly what they did. But again, the district court improperly did not weigh the reason for the delay factor heavily against the government because it thought it required the defendants to show bad faith on the part of the government. We know from Ingram that that was just wrong. It should have weighed heavily. And what the case law says is when you have those factors weighing heavily against the government, you can presume prejudice. It's kind of like a chronic situation where we can't... So if the district court said there was no, I find there's no bad faith on the part of the government. Right. Is that a finding of fact to which we apply a clearly erroneous standard of review? I would believe bad faith is probably... Well, I mean, we don't disagree that there is no bad faith. But it's a legal error that the court made in saying that the law requires a defendant to show bad faith to get... You agree with the lower court that there's no bad faith? Well, I mean, bad faith is you're talking about dishonesty or something like that. And I don't think there's any issue that the delay was for the purpose of trying to gain a strategic advantage. That would be bad faith. This record reflects negligence on the part of the government. Well, I disagree. This record reflects the finding, which is entitled to a clearly erroneous standard, finds gross negligence. And remember, gross negligence, we're talking about the lack of diligence that even a careless person is accustomed to exercising. So even the definition of gross negligence wraps in the lack of diligence that we're talking about. And so, as I said earlier, the space between lack of diligence and bad faith, I mean, there's a very thin crack of light coming through that space. So we're all the way over on the end. And that gets the ways heavily against the government, even without a specific finding that they intentionally did this in order to gain a strategic advantage. How does it play into your analysis that, and I think this is undisputed, that as soon as Donnelly realized his mistake, I mean, you can see it on the face of the record, he was like, holy cow, got to fix this ASAP and did it. I mean, doesn't that reflect not just good faith, but I mean, isn't that, doesn't that bear on the degree of negligence that we're dealing with here? Well, I think it does bear on the degree of negligence that we're dealing here because it shows that the defendants could have been arrested within two weeks of this happening. It didn't have to wait for the two years. I guess my point is that as between, on the spectrum between Clark and Ingram, I mean, doesn't it show that this was an honest mix-up mistake and really nothing more? As soon as he realized it, he thought, oh my gosh, I've got to fix this. Right. Well, I mean, it probably was an honest mistake, but the problem was everybody else knew and he should have known. The U.S. attorney knew and nobody, he didn't talk to the U.S. attorney for two years. But neither of your clients were even in the Northern District of Georgia. They're not within the geography of the district. One was in, what, New York and one in Miami? That's correct. But I don't think that's really relevant to the inquiry in that they had the driver's licenses of both. They knew exactly where they were. It took no time to find them. It's a consideration, isn't it? I mean, you've got to lump all the different facts together to see what the situation is. Every situation is different, don't you agree? Oh, of course. And this is a case-by-case analysis. But the fact that they're living in different places, they know where they are. So I don't think that makes, even if it's a factor to be considered, I don't think it's a very compelling factor. And I see my lights are flashing, so I'll be back. All right. You've reserved some time. We'll hear from the government. Mr. Cashaw. Good morning, counsel, and may it please the Court. I'll start by stating the obvious here. The government was negligent in this case. The magistrate judge, in fact, found that the government was grossly negligent in this case. What happened here never should have happened, and hopefully it will never happen again in the U.S. Attorney's Office. Now, that being said, the questions that are before us today rely on, or turn on, a legal test for which the government has two paths through which it can prevail. The first is if this Court agrees with the district court that the length of delay does not weigh heavily against the government. Then, in that instance, this Court should affirm the district court. And the second, independent of that, is if this Court determines that the reason for delay does not weigh heavily against the government. And in that instance, once again, this Court should affirm the district court. So there are two paths through which this Court may affirm, and there's only one path through which the Court may reverse, which would require finding that both of those Barker factors, length of delay and reason for delay, both weigh heavily against the government. And in this case, the fact finding that has been conducted by the district court essentially forecloses a finding, it forecloses arguing either length of delay or reason for delay on the factual front. The fact finding forecloses the defense from now arguing that the district court erred. I'd like to start first by talking... What if we look at this record and determine that there was bad faith on the part of the government? I mean, there was obviously an assistant United States attorney assigned to the case from the very beginning. It's hard for me to believe that the assistant United States attorney for two years didn't follow up. Why haven't these defendants been arrested yet? Your Honor, if the district court had found that there was bad faith and that there was two years of bad faith, I believe that this would be a different case. And it is possible that the district court could have ruled in favor of the defense and found that the reason for delay weighed heavily against the government along with the length of delay. But that's not what occurred here in this case. What if we disagree with the lower court and we look at the record and determine that there was bad faith? Thompson knew that the marshal's office was not in charge, but he never conveyed that information to Michael Donnelly. Why isn't that bad faith? Your Honor, I think, well, to take a step back, in order to reach that, in order to go down that path, the court first would have to determine that the district court clearly erred in concluding that there was no bad faith. And to do so, this court would have to also decide that there's not two permissible views of the evidence, that in this instance, it is so obviously bad faith that it is not conceivable that the district court could have determined that there was no bad faith. So it's a very high standard to begin with to go down the clearly erroneous route. And I mean, I guess, I don't mean to throw you off your stride, but I mean, I guess it's pretty clear right from the record that the district court was pretty well ticked at Thompson, right? He said this is inexplicable. It defies logic. But nonetheless, sort of baking all of that into its analysis, the district court nonetheless said still no bad faith. Yes, Your Honor, that's correct. And that district court or the magistrate judge had the benefit of seeing both TFO Donnelly and TFO Thompson testify and came to the findings that she came to, noted that it was inexplicable, noted that it defied logic, and even found that the government was grossly negligent. Now, all that being said, the magistrate judge did not say that the agents had acted in bad faith. And there is no dispute from the facts that TFO Donnelly was simply mistaken about the procedure. And that's what the district court said in its decision after the R&R was issued. The district court made clear that TFO Donnelly had just made a mistake. And that mistake, while bad, was not one that was born out of bad faith. And in fact, as Your Honor noted previously, when TFO Donnelly determined that he had made a mistake, he moved very quickly to address the mistake that he had made and advance the case at that point. Yeah, the district court could have come to a contrary conclusion. When I look at this record, I think the lower court cut these law enforcement officers some slack here because if Thompson is telling the truth and he did not inform Donnelly, then Thompson acted in bad faith. And if Thompson is lying and he did tell Donnelly, then Donnelly acted in bad faith by not arresting the defendants. I understand the district court came to a contrary conclusion. And we, you know, we defer to the determination by the district court. But there are a lot, I mean, there's a lot of things that took place here that should not have taken place. Your Honor, I totally agree. And I do think that there is a portion of the testimony from the evidentiary hearings where the TFOs both testified. They just couldn't recall what had happened because so much time had elapsed. So, Your Honor, I agree that this never should have happened and that this was a particularly egregious mistake by the TFOs in this case. Let me ask you about, Donnelly was a local policeman assigned to the FBI task force. This was, he was made the sole investigator, but apparently this is the first time he'd ever acted for the FBI. How many people were in this task force and who was supervising the task force? Surely somebody was. Yes, Your Honor, there was a supervisor from the FBI. And the supervisor's name, I don't recall, it is in the transcript. I don't think I've seen it. It's in the transcript, Your Honor. But in the transcript from the evidentiary hearing, however, there's nothing in the record about how many other people were on the task force. So I don't have an answer for that question right now, Your Honor. Well, you just get the impression that there was nobody in charge. I think that the facts in this case show that TFO Donnelly was working the case independently and that there came a point approximately 23 months after the investigation was opened when during a case review, the TFO was informed that he was responsible for executing his own arrests. And that certainly should have been made clear to him earlier than that date, Your Honor. What sorts, you mentioned at the outset, you said this was an egregious mistake, never should have happened. We hope it never happens again. I'm not really sure how relevant this is to our analysis, but just for our own peace of mind, what sorts of procedures have we put in place to ensure that this doesn't happen again? Your Honor, there's no official procedures that I can speak about here. I can say that this is an unusual event. And to my knowledge, it hasn't occurred previously in our district. This did involve an AUSA who left the office. And so with the AUSA leaving the office and with the TFO being unaware of his duties, this did, there was a delay in us discovering that this case had been sitting out there with an arrest warrant. And speaking of delay, I think that they're setting aside the reason for delay. The length of delay here, that inquiry, I think, is pretty clearly established to be a factor that does not weigh heavily against the government. In this instance, as Your Honors know, there is a threshold inquiry for length of delay and that's 12 months or more. That is certainly satisfied here. But after that point, there is a question of how far beyond that first 12 months did this delay continue? And in this instance, Mr. Mendelson has mentioned that there was, he now says, a 34-month delay. And I'd like to note for the record that the delay, the time that elapsed from the point of the defendant's arraignment, which was on November 6, 2015, approximately a month later on December 11, 2015, the first speedy trial motion was filed by Mr. Mendelson. And from December 11, 2015 until November 3, 2016, so approximately 11 months went on when this issue was being litigated. And after those 11 months elapsed, the issue was decided and both the defendants, Urenga and Oliva, both pleaded guilty in January. So the extra time, the 34 months, I think, doesn't give any credit to the fact that this issue was being litigated essentially that entire time frame. So looking at the 23-month delay, that's less than two times what would be considered presumptively prejudicial. And in the Clark case, the court noted that that was meaningful. And when you look at the other cases that have been decided on this matter, you'll see instances where the length of delay weighs heavily against the government or instances where it's four or five times as long of a delay, of the presumptive delay, that being cases like Barker and Doggett, where there's a five-year delay in Barker, an eight-year delay in Doggett. And then on the other side, there are cases which have been cited in the briefing. Cerna-Villareal, which is a three-and-a-half-year delay, that did not weigh heavily against the government. Jackson, which is a 22-month delay. Beeman, 20-month delay. The Clark case talks about another case from the Eleventh Circuit called Robinson, which was a 14-and-a-half-month delay. This case falls more closely in line with those cases where the courts determined that the delay did not weigh heavily against the government. And it seems today there's not really a question about the complexity of the investigation and that there was no inordinate pre-indictment delay, which means we're looking at a 23-month delay in which there was no prejudice against the defendants. And given that, given the fact that it's undisputed that there's no prejudice and that this delay falls in line with Clark in terms of length of delay, 17 months versus 23 months, and the fact that Clark and this case both have the same reason for why the delay occurred, which was that mistaken belief that the officer responsible for the arrest was not actually responsible for the arrest. So the mistake that the arresting officer had made makes this fall squarely in line with Clark. And based on that, and independent of any other analysis on reason for delay, this court could and should affirm, based solely on the fact that the length of delay does not weigh heavily against the government. Because without that, the defendants cannot succeed in a claim under Barker v. Wingo. Turning to the reason for delay, the district court, I think, was correct in concluding that this case was more like Clark. And I've kind of talked about it already previously, but Clark is a case in which it is hard to say that there was a lack of diligence where the task that one was supposed to do is not known. So the officer didn't have an opportunity to lack diligence because he didn't know that there was a responsibility for him to do something. And that's the exact same thing that occurred here in this case. And that, I think, separates Clark in this case from all the other cases that are discussed in the briefing and all the other cases that defense counsel has identified. And I think that that's enough to affirm the district court and support the district court's finding that the reason for delay does not weigh heavily against the government. And, Your Honor, if there was some discussion about the fact-finding that occurred in the district court, there doesn't appear to be any true challenges in the briefing about whether those facts are correct. So there hasn't been a strong attack on the fact-finding. And without that, with the facts that the district court found in this case, the district court should be affirmed. How do you distinguish gross negligence from a lack of diligence? Your Honor, I think I agree largely with Judge Newsom's characterization of those words. They're labels. They're labels, but those labels and the delicacy with which those labels are used, it's difficult to pull them apart when you have a multi-factor balancing test in which at least some of the precedent provides language that says, provides language that was cited by the district court about a failure to pursue a defendant diligently will weigh against, will weigh against the government more or less heavily depending on if the government acted in good or bad faith. And that discussion has happened in connection with negligence. So I don't think that you can really pick those two apart. I think it's more important to look at kind of holistically what occurred in the case and not rely on those labels as much and look at all the facts and see which case this lines up with more rather than say, this case is a case of negligence, therefore it is always a neutral reason and therefore it's neutral and weighs slightly against the government in every instance. I just, I don't think that the cases support that reasoning. It just happens to be that the cases have language like that because each case has been examined on its own facts. So I wouldn't cling too tightly to the question of having to resolve negligence versus a lack of due diligence. I think that cases like Ingram, Your Honor, where the court talks about, I mean, Ingram is an example where there is negligence and the court says that the negligence is so egregious that the district court erred in finding that there was no speedy trial violation. So I think that shows you that these labels don't necessarily control where the case should fall within the case law. This case is more like Clark. All right. Thank you. Thank you, counsel. We'll hear again from Mr. Mendelson. I think the Supreme Court case of Doggett tells us that these labels do actually matter. Because what, Doggett was a negligence case and what the Supreme Court said is negligence is on the wrong side of the line. It weighs against the government. And there's a spectrum. As you go toward the government doing an intentional act to gain a strategic advantage, that's at the end of the spectrum. Good faith, diligent efforts, that's on the other end of the spectrum. Negligence on the wrong side. But as you get closer to the one end of the spectrum, the bad end of the spectrum, the delay happens that you need to have a speedy trial violation goes down. And so, you know, cases like Clark, you've got a negligence case. That's closer to the center but on the wrong side. Here we have a gross negligence case in which they've equated gross, we equate gross negligence to a lack of diligence. That puts us closer to the bad end of the spectrum, which in turn brings down the length of time that's required in order to show a speedy trial violation. So that's why you have to focus on the reasons, right? Of course, of course. So how does that balance out on that same spectrum? Well, here the reasons given, I didn't know, I thought the marshals were going to do it, is not a particularly good, compelling reason given the collective knowledge of Thompson, the U.S. Attorney's Office and everyone else who did not act in order to rectify this problem and make it not a 24-month or 34-month delay. Well, Donnelly was not an FBI agent. He was just a local policeman that was deputized as part of the task force. So you can't say that he knew the procedures, right? He was a newcomer to this business. True, but we should expect more of federal agents. He is a deputized federal agent. He could have asked, right? Of course, and he should have asked. And there's a supervisor who, if this is the case where we have somebody who he thinks doesn't know what's going on, the supervisor should have been there monitoring. In addition, the U.S. Attorney has an obligation here. Yeah, presumably there was a supervisor. What does the record say why he didn't get involved more or at all? Apparently, he didn't get involved at all. The record was just, all we know is I had a supervisor and we did a case review two years into this and it was the first time we did a case review together and that's how we discovered it. So we didn't have a supervisor in for our evidentiary hearing. So there's really no record on that. And to address, Judge Newsom, your question about what procedures are there that ensure this doesn't happen again, there aren't procedures out there. But the way we ensure it doesn't happen again is this Court publishes an opinion reversing, telling every law enforcement agent, every task force member that it's no excuse to blame the marshals or thank the marshals. This is your obligation. We know it's your obligation and if you don't do it, there are consequences. That's what the Speedy Trial Protection is all about. Finally, the government has talked about the reason for the delay issue. In the district court, it took the position that this was gross negligence and that the court equated the gross negligence to that of Ingram. I think the government's bound by that and to the extent that any kind of argument here is different. I think the case, the waiver case laws we've cited in our reply brief would preclude the government from making that argument. So I see that I'm about out of time unless there are other questions. Thank you. Thank you. And court is in recess until nine o'clock tomorrow morning. Thank you.